## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | **Bankruptcy No. 11-22894-CMB** |
| | ) | |
| **GREGORY J. HANNAN,** | ) | **Chapter 7** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| **ENTERPRISE BANK,** | ) | **Adv. No. 11-02442-CMB** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **GREGORY J. HANNAN,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The matter before the Court is Enterprise Bank's Complaint Objecting to Discharge of Debtor. Enterprise Bank ("Enterprise") commenced the above-captioned adversary proceeding opposing the entry of the Debtor's discharge pursuant to 11 U.S.C. §727(a)(2),(4), and (5), or alternatively, to obtain a determination that the debt owed to it is nondischargeable pursuant to 11 U.S.C. §523(a)(6).[1] For the reasons stated herein, this Court finds that the Debtor is not entitled to a discharge pursuant to §727(a)(4), and in the alternative, a portion of the debt owed to Enterprise is otherwise nondischargeable pursuant to §523(a)(6).

---

[1] The Court has jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This is a core matter pursuant to 28 U.S.C. §157(b)(2)(I) and (J), and the Court will enter final judgment in this adversary proceeding. However, if the United States District Court determines pursuant to the rationale set forth in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), that this Court does not have the authority to enter final judgment, then the Memorandum Opinion and Order entered shall constitute the Court's proposed findings of fact and conclusions of law and recommendation to the District Court.

## I.    Background and Procedural History

Gregory J. Hannan ("Debtor") served as the President and 90% owner of a Pennsylvania corporation, Rebecca J's Gourmet, Inc. ("Rebecca J's"), which was in the business of manufacturing candy and other food. Enterprise Bank ("Enterprise") is a creditor of the Debtor based upon the Debtor's guaranty of two loans made to both Rebecca J's and another entity, G.H. Real Estate Holdings, LLC ("G.H. Real Estate"). G.H. Real Estate owned certain real property, which the Debtor intended to renovate and use as the facility for operating Rebecca J's. Ultimately, however, Rebecca J's ceased operations, and the bank foreclosed on the property owned by G.H. Real Estate.

On May 5, 2011, the Debtor filed for relief under Chapter 7 of the Bankruptcy Code. During the pendency of the bankruptcy case, the Debtor, as President of Rebecca J's, assisted Enterprise in the collection of its collateral, which consisted of property of Rebecca J's. In the process of collecting its collateral, Enterprise discovered that two items were missing. That discovery and the circumstances surrounding the disposition of the collateral led to the commencement of this proceeding opposing the Debtor's discharge.

Trial was held on June 25, 2012. Two witnesses testified at trial: Joseph Fidler, in-house counsel for Enterprise, and the Debtor. As the parties informed the Court that neither would be filing post-trial briefs, the matter is ripe for decision.

## II.    Findings of Fact

Prior to incorporating in 2008, Debtor's business was operated under and funded primarily by his father's construction company, Remarkable Designs, Inc. ("Remarkable Designs"). Debtor's father, Mark Hannan, is the majority owner of Remarkable Designs, and

Debtor, at least at one point in time, also possessed an ownership interest in Remarkable

Designs. In order to expand his food and candy business and relocate to a larger space, Debtor

approached Enterprise for a loan and incorporated the business.

In December 2008, Enterprise extended to Rebecca J's and G.H. Real Estate

(collectively, the "Borrower") two loans, the first in the amount of $318,500 and the second loan

in the amount of $36,687 (collectively, the "Loans"). In connection with the first loan, the

Borrower granted a security interest to Enterprise in all Inventory, Chattel Paper, Accounts,

Equipment, Instruments, General Intangibles and other items then owned or thereafter acquired.

The Debtor executed and delivered two guaranties in connection with the Loans.

Among the items purchased for the business, Rebecca J's ordered an S-92 Warrior

Firemixer ("Firemixer") and a Liftiltruk Confection Autotilt ("Liftiltruk") from Savage Bros. Co.

("Savage Bros.") at a cost of approximately $28,000. It is undisputed that these items, as

equipment, constituted collateral of Enterprise. Pursuant to the agreement with Enterprise, other

than in the ordinary course of business, the Borrower was not to remove the collateral from its

location without the consent of Enterprise and was not to sell, transfer, or dispose of the

collateral.

Due to a series of unfortunate circumstances which are not relevant to this proceeding,

Rebecca J's encountered financial difficulties causing it to default on its obligations to

Enterprise. Accordingly, Enterprise caused judgment to be entered against Rebecca J's and G.H.

Real Estate in the Court of Common Pleas of Allegheny County. Debtor, in his capacity as

President of Rebecca J's, assisted Enterprise in the repossession of the collateral and, in fact, was

deposed on two occasions in connection therewith.

At the deposition on June 2, 2011, Debtor identified the Firemixer as a candy cooker that was in storage. The deposition was continued until after the equipment in storage could be turned over to Enterprise. At the continued, very brief deposition on August 1, 2011, counsel for Enterprise read the following statement to the Debtor:

> This is a continued deposition from June 2nd, 2011, at which time we had an in-depth conversation regarding assets of Rebecca J's, a now defunct corporation. At that time we discussed the assets of Rebecca J's in an attempt to make sure that all the equipment that was owned by Rebecca J's was turned over to the bank.
>
> After the June 2nd, 2011 deposition, I did a comparison of the invoices, which were exhibits to the deposition, with the collateral that was turned over, and I discovered that there was a major item that was missing, that was the S-92 Warrior FireMixer. Subsequently you turned the firemixer over on July 26th, 2011.
>
> Do you agree with everything in that statement?

*See* Exhibit C, at 4-5. The Debtor answered in the affirmative. Debtor also testified that, with one exception not at issue in this case, all assets of Rebecca J's, whether existing before or after the December 2008 loan, had been turned over.

Subsequently, Enterprise contacted Savage Bros. to inquire as to whether the company had an interest in purchasing the Firemixer. Through communication with Savage Bros., it was discovered that Enterprise never had possession of the Firemixer after all as the Debtor sold the Firemixer, along with the Liftiltruk, to Savage Bros. in June 2010, over one year earlier. Email correspondence between the Debtor and Savage Bros. confirms the details of the transaction.

There is no doubt from the email correspondence between Debtor and Savage Bros. that (1) Debtor orchestrated the sale of the equipment back to Savage Bros., (2) Debtor instructed the funds for the purchase of the equipment to be wired to an account for Remarkable Designs and (3) funds in the amount of $22,285 were, in fact, deposited in Remarkable Designs' account pursuant to Debtor's request. Furthermore, Debtor arranged the sale knowing that the equipment

was subject to the security interest of Enterprise. Debtor neither informed Enterprise of the

transaction nor provided Enterprise with the proceeds.

After Enterprise became aware of the disposition of the collateral, Enterprise commenced

an action in state court against Rebecca J's, Remarkable Designs, and Mark Hannan. Enterprise

obtained a default judgment against Rebecca J's on its claim of conversion. Subsequently,

judgment based on conversion was entered in favor of Enterprise and against Remarkable

Designs, and judgment based on conversion and intentional interference with contractual

relations was entered in favor of Enterprise and against Mark Hannan. In addition to the state

court litigation, Enterprise commenced this adversary proceeding against the Debtor.

### III.    Conclusions of Law

Based on the foregoing facts, Enterprise asserts that the Debtor is not entitled to a

discharge pursuant to §727(a)(2),(4), and (5). In the alternative, Enterprise contends that its

entire debt is nondischargeable pursuant to §523(a)(6). The Court will address each in turn

beginning with Enterprise's assertion that the Debtor's discharge should be denied under several

provisions of §727.

At the outset, the Court notes that "[c]ompletely denying a debtor his discharge, as

opposed to . . . declining to discharge an individual debt pursuant to §523, is an extreme step and

should not be taken lightly." *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993). "Congress

described §727's discharge provision as 'the heart of the fresh start provisions of the bankruptcy

law.'" *Id.* (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 384 (1977)). Therefore, when

applying §727, the Court should construe the discharge provision liberally in favor of the debtor.

*Rosen*, 996 F.2d at 1531. The creditor opposing discharge has the burden to establish the

5

requisite elements by a preponderance of the evidence. *See Serio v. DiLoreto* (*In re DiLoreto*),

266 Fed.Appx. 140, 144-45 (3d Cir. 2008). With this guidance in mind, the Court applies

§727(a)(2),(4), and (5) to the facts.


11 U.S.C. §727(a)(2)

As the transfer of collateral occurred post-petition, the Court applies §727(a)(2)(A),

which provides that discharge is appropriately denied when it is established that "the debtor, with

intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated,

or concealed . . . property of the debtor, within one year before the date of the filing of the

petition[.]" Pursuant to the plain language of the statute, the property must have been "property

of the debtor."

Although the Debtor undeniably orchestrated the sale of the collateral, the equipment was

that of Rebecca J's, a separate entity from the Debtor. Enterprise contends the statute is

applicable based on Debtor's ownership and control of Rebecca J's. Similar facts were present in

*GMAC Inc. v. Coley* (*In re Coley*), and GMAC asserted the same argument that Enterprise urges

this Court to accept. *See* 433 B.R. 476, 487-89 (Bankr. E.D. Pa. 2010). In *Coley*, the debtor was

the owner, president, and principal of an automobile dealership, which received financing from

GMAC. *Id.* at 483. The debtor personally guaranteed payment of the indebtedness. *Id.* GMAC

contended that the individual debtor's discharge could be denied because he controlled the

business entity and the entity transferred GMAC's collateral. *Id.* at 489. In light of the fact that

§727 is to be construed in favor of the debtor, the court held that §727(a)(2)(A), "does not

support the denial of an individual's bankruptcy discharge based on transfer or concealment of

property if the debtor lacks an ownership interest in the transferred property – at least in the

6

absence of grounds to treat the entity as the debtor's alter ego." *Id.* 488-89. The court would not ignore the plain language of the statute requiring a disposition of "property of the debtor." *Id.* at 489.

This Court finds the analysis in *Coley* persuasive. Enterprise has not established, or even attempted to establish, that the corporate entity of Rebecca J's should be disregarded. Therefore, there has been no prepetition disposition of property of the Debtor, and thus, there is no need to reach the issue of the Debtor's intent. Enterprise did not prove the elements of §727(a)(2)(A).

<u>11 U.S.C. §727(a)(5)</u>

Pursuant to §727(a)(5), a debtor's discharge will be denied if "the debtor has failed to explain satisfactorily, before determination of denial of discharge . . . , any loss of assets or deficiency of assets to meet the debtor's liabilities[.]" In order to prevail, "[t]he objecting party must first make a showing that the debtor 'at one time owned substantial and identifiable assets that are no longer available to his creditors.'" *Coley*, 433 B.R. at 489 (quoting *In re Wasserman*, 332 B.R. 325, 333 (Bankr.N.D.Ill.2005)). Applying a burden shifting approach, the debtor then must provide a satisfactory explanation in response. *Id.* For purposes of this provision, the propriety of the disposition of the assets is not the court's concern. *Id.* Rather, the court, in its discretion, must determine whether the explanation provided by the debtor is satisfactory. *Id.* An explanation is satisfactory if it (1) consists of more than a vague, uncorroborated statement, (2) is deemed worthy of belief by the court, and (3) leaves no question as to what happened to the unavailable assets. *Id.*

According to Enterprise, denial of discharge is appropriate pursuant to this provision as the Debtor has failed to satisfactorily explain what happened to the proceeds from the sale of

7

Rebecca J's equipment after the funds were deposited in Remarkable Designs' account. As previously stated, the loss of assets does not relate to assets of the Debtor, and the application of this provision to these facts is questionable at the outset. Even putting this concern aside, with respect to the collateral identified, the disposition is known. The Firemixer and Liftiltruk were sold by the Debtor, on behalf of Rebecca J's, to Savage Bros. Thereafter, Savage Bros., at the instruction of Debtor, wired the funds for the items to an account in the name of Remarkable Designs. Although none of these facts came to light by virtue of the honesty of the Debtor, the information provided by Savage Bros. alleviated the need for the same disclosure by the Debtor. This Court understands what happened to the assets. The transaction is well documented by the evidence, and the Court is satisfied. *See Sonders v. Mezvinsky* (*In re Mezvinsky*), 265 B.R. 681, 699 (Bankr. E.D. Pa. 2001) ("There is perhaps no better an explanation as to where specific funds went than a check which clearly identifies a payee. In short, Movants' own allegation provides a satisfactory explanation as to where the funds went[.]"). To the extent that Enterprise seeks an explanation from the Debtor as to what occurred after the funds were wired to Remarkable Designs' account, Enterprise seems to reach beyond the requirement of the statute.[2] The disclosure that would have been required from Debtor has been provided, granted through other means, and denial of discharge pursuant to §727(a)(5) is not appropriate.

---

[2] What Remarkable Designs did with the funds appears to be a question more appropriately addressed to Mark Hannan and/or Remarkable Designs. Neither Remarkable Designs nor Mark Hannan is a party to this proceeding, and the Court notes that Enterprise obtained a judgment against both in a separate state court action.

11 U.S.C. §727(a)(4)

A discharge will not be granted if "the debtor knowingly and fraudulently, in or in connection with the case – made a false oath or account[.]" *See* §727(a)(4)(A). Accordingly, in order to establish that denial of discharge is appropriate, "the complaining party must prove by a preponderance of the evidence that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *See Melarango v. Ciotti* (*In re Ciotti*), 448 B.R. 694, 703 (Bankr. W.D. Pa. 2011). Enterprise contends that the Debtor made false statements such that denial of discharge is appropriate.[3]

Enterprise alleges that the Debtor provided false testimony when he was deposed in his capacity as President of Rebecca J's. Specifically, the Debtor testified at the August 2011 deposition that he turned over the Firemixer when, in fact, the Firemixer was sold to Savage Bros. in June 2010. The statement was false and made under oath at the deposition. As the Debtor was the individual who orchestrated the sale of the highly valuable equipment, there is little doubt that the testimony was given "knowingly and fraudulently." However, pursuant to the plain language of the statute, the false oath or account must be made "in or in connection with the case." As the deposition was not taken as a part of the bankruptcy proceedings, the question is whether the deposition was taken in connection with the bankruptcy case.

Very little case law exists on the interpretation of "in or in connection with the case." For guidance, this Court looks to *In re Kaufhold*, 256 F.2d 181 (3d Cir. 1958). In *Kaufhold*, a similar

---

[3] To the extent Enterprise suggests that a denial in Debtor's Response to the Complaint may constitute a false oath or account, the Court finds that a denial, even if false, does not satisfy the requirement of §727(a)(4)(A). *See Spyra v. Finney* (*In re Finney*), 333 B.R. 242, 250 (Bankr. W.D. Pa. 2005). The Debtor's Response to the Complaint was signed by Debtor's counsel alone. Thus, the denial made therein is not sufficient for purposes of §727(a)(4)(A).

issue was presented requiring interpretation of a provision of the Bankruptcy Act, under which a

bankrupt was denied discharge if he "knowingly and fraudulently [made] a false oath or account

in or in relation to any bankruptcy proceeding." *Id.* at 183. In *Kaufhold*, the bankrupt was

determined to have made a false oath in his answer, accompanied by an affidavit, filed in a state

court proceeding, and the referee examined the relatedness between the bankruptcy proceeding

and the state court action:

> [T]he State Court's action was an integral part of the bankruptcy proceedings
> inasmuch as it sought to make assets of the bankrupt available to his creditors;
> that the Trustee in Bankruptcy had been authorized by the Bankruptcy Court to
> join in the institution of the State Court action; and that the oath taken by the
> bankrupt to his Answer was 'in relation to a bankruptcy proceeding.'

*See id.* at 185. The Court of Appeals agreed with the analysis of the referee without further

discussion. *Id.* The analysis in *Kaufhold* provides guidance as to the interpretation of §727(a)(4).

The facts in *Kaufhold* are not present in this case. Although the deposition was taken after

the bankruptcy case commenced, the position of Enterprise is undermined by the characterization

of the deposition by its counsel:

> [T]he purpose of this deposition today is to discuss the assets of Rebecca J's and
> G.H. Real Estate. I'm not going to be asking you anything about your personal
> liability or personal assets. That is all covered under your bankruptcy. I'm going
> to make it clear and make a distinction. If I say you or your, I'm meaning either
> Rebecca J's or you, in your capacity as President of Rebecca J's. So I just want to
> make that clear.

*See* Exhibit A, at 8. Counsel for Enterprise carefully emphasized that the purpose of the

deposition was separate from the Debtor's bankruptcy case. Although the Court is troubled by

the Debtor's testimony in the deposition, what is lacking is the connection to this bankruptcy

case. The Firemixer was neither property of the Debtor nor property of the bankruptcy estate.

Although Enterprise is a creditor of the Debtor, the deposition was not intended to be a

deposition of the Debtor, personally, but rather in his sole capacity as President of Rebecca J's.

10

Due to the clear language of the statute and the fact that discharge provisions are to be construed

in the light most favorable to the Debtor, the false statement regarding turnover of the Firemixer

at the deposition is not a basis upon which to deny discharge pursuant to §727(a)(4). However,

the Debtor's credibility is undermined by the fact that he offered no satisfactory explanation for

his untruthful testimony in the August 2011 deposition.

Enterprise also contends that the following statement made by the Debtor in his affidavit

filed in this adversary proceeding is false: "The money received from the sale of the firemixer

and liftiltruk was used to purchase smaller specialized equipment to meet the needs of the items I

was trying to produce in order to keep operating." *See* Exhibit R. The Debtor contends the

smaller equipment was purchased from Remarkable Designs. The Debtor's statement is an

attempt to offer an innocent explanation for his misconduct and is highly suspect.

Enterprise contends that the statement must be false as the Debtor testified in his June

2011 deposition that he ceased conducting business under the corporation of Rebecca J's around

January 2010, i.e. prior to the sale of the equipment to Savage Bros. Thus, according to

Enterprise, there was no need to replace the large equipment with smaller equipment. At trial, the

Debtor offered vague testimony as to whether operations actually continued under Rebecca J's

beyond January 2010 or whether he was operating independently from the corporation after that

time. Nonetheless, he testified that he misspoke at the deposition and business continued until at

least January 2011. This Court finds that the Debtor's testimony was not credible. If, as the

Debtor asserted at trial, he ceased operations in January 2011, approximately six months prior to

the June 2011 deposition, it is difficult to believe that the Debtor mistakenly testified that the

business ceased eighteen months earlier. The far more likely explanation for the Debtor's change

11

in testimony is his need to demonstrate that he possessed no fraudulent intent with respect to his disposition of Enterprise's collateral.

This Court finds the Debtor's statement as to the purchase of smaller equipment with the proceeds of the sale of the Firemixer and Liftiltruk to be untruthful. No documentation of the purchase of smaller equipment from Remarkable Designs was produced at trial. In addition, the Court can find no proper motive for directing the proceeds of the sale to be deposited in Remarkable Designs' account. The circumstances surrounding the transaction suggest an intent to place the proceeds beyond the reach of Enterprise. It is too coincidental to believe that the full amount that Savage Bros. paid for the very valuable Firemixer and Liftiltruk was the same value assigned to various, older, unidentified smaller equipment in an undocumented "swap", essentially between a father and son. Additionally, although Rebecca J's was incorporated in 2008, and apparently an independent entity from Remarkable Designs since that time, the Debtor would have the Court believe that the construction company retained what was apparently valuable food making equipment until June 2010 when the Debtor once again unexpectedly needed the equipment that he had previously abandoned. Furthermore, had the Debtor's explanation regarding the disposition of the equipment been as innocent as he contends, there would have been no reason for him to falsely testify at the August 2011 deposition regarding turnover of the Firemixer. The facts do not support the Debtor's statement in his affidavit.

Based on the foregoing, the Court finds that the Debtor made a false statement in his affidavit filed in this adversary proceeding. Furthermore, as the Debtor operated the business of Rebecca J's, coordinated the sale of the collateral, and directed the proceeds to be deposited in Remarkable Designs' account, there is no doubt that the Debtor knew the statement to be false when he made it. The statement appears to be offered in response to Enterprise's allegations of

fraudulent intent in this proceeding. Therefore, the statement is material and was made with the intent to mislead the Court as to the true nature of the transaction. Although denial of discharge is an extreme step, discharge is reserved for only the honest but unfortunate debtor. Therefore, pursuant to §727(a)(4)(A), discharge must be denied in this case.

Although this conclusion is sufficient to end the analysis, to be thorough, Enterprise's alternative argument pursuant to §523 is also addressed.

11 U.S.C. §523(a)(6)

As a preliminary matter, the statutory exceptions to discharge set forth in §523 must be viewed in light of the underlying policy of the Bankruptcy Code, i.e. the goal of providing a fresh start, and "are generally construed 'narrowly against the creditor and in favor of the debtor.'" *Boston Univ. v. Mehta* (*In re Mehta*), 310 F.3d 308, 311 (3d Cir. 2002) (quoting *In re Pelkowski*, 990 F.2d 737, 744 (3d Cir. 1993)). The party opposing discharge has the burden of proving nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). In light of these standards, the Court will address the applicability of §523(a)(6) to the facts of this case.

Pursuant to §523(a)(6), "any debt – for willful and malicious injury by the debtor to another entity or to the property of another entity" is nondischargeable. As to the willfulness component, §523(a)(6) requires more than simply a deliberate or intentional act causing injury. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). The actor must have either "purposefully inflicted the injury or acted with substantial certainty that injury would result. *Conte v. Gautam* (*In re Conte*), 33 F.3d 303, 305 (3d Cir. 1994). As to the malice requirement, the act resulting in the injury must be "wrongful and without just cause or excuse, even in the absence of personal

13

hatred, spite or ill-will." *See Wymard v. Ali* (*In re Ali*), 321 B.R. 685, 693 (Bankr. W.D. Pa. 2005) (citing 4 Collier on Bankruptcy ¶523.12[1] at 523-91). Accordingly, Enterprise must establish willful and malicious injury.

"A common fact pattern in §523(a)(6) proceedings involves a secured creditor's claim that a debtor's conduct, in violation of loan and security documents, diminished, impaired or extinguished the creditor's collateral, thereby inflicting a 'willful and malicious injury' to the creditor's property." *Coley*, 433 B.R. at 500. Although courts are divided as to the appropriate resolution of these cases, some consensus exists:

> First, most courts do not categorically rule out the possibility that a purposeful breach of a contract, in some circumstances, can cause a willful and malicious injury, particularly if the breach is accompanied by a tortious act, such as conversion. Second, "[s]imply because the sale [of the collateral] was in violation of the security agreement and was in fact an intentional sale on the part of debtor should not be enough to trigger a finding of malice."

*See id* at 500-01. (quoting *In re Grier*, 124 B.R. 229, 233 (Bankr. W.D. Tex. 1991)). Courts have examined the particular sets of circumstances to determine whether the conversion is in the nature of an intentional tort or whether the conduct rises only to the level of negligence or recklessness. *Coley*, 433 B.R. at 501. The latter cases do not support a §523(a)(6) action.

In this case, the facts support a finding of willful and malicious injury. The Debtor transferred the Firemixer and Liftiltruk to Savage Bros. knowing that the equipment was subject to the security interest of Enterprise. The resulting harm was willfully caused by the Debtor, who was well aware of the harm that would result. In his affidavit, the Debtor states, "At no time did I intend to defraud or dishonor my financial obligations to Enterprise Bank but they refused to work with me on the terms of the loans." *See* Exhibit R. Acting with the knowledge that Enterprise would not alter the terms of the agreement, Debtor transferred the Firemixer and Liftiltruk to Savage Bros. and directed that the funds be deposited in an account owned by

14

Remarkable Designs and outside of the reach of Enterprise. Such conduct does not support the Debtor's statement that he had no intent to defraud or dishonor his obligations to Enterprise and instead supports a finding of malice. In an attempt to conceal the conduct which he knew to be wrongful, the Debtor falsely testified that the Firemixer was turned over to Enterprise at his August 2011 deposition. Debtor has offered no satisfactory explanation for his deceptive, intentional conduct. Debtor's actions cannot be defined as solely negligent or reckless. The injury to Enterprise was willful and malicious pursuant to §523(a)(6).

Accordingly, the debt owed to Enterprise, to the extent it is a debt for willful and malicious injury by the debtor, is nondischargeable. This Court finds that the amount attributable to the Debtor's conduct causing "willful and malicious injury" is the amount that Enterprise would have recovered had the Firemixer and Liftiltruck been turned over by the Debtor. The only evidence of the value is the amount that Savage Bros. paid for the items in June 2010, and this Court finds that to be an appropriate valuation. Therefore, in the alternative to denial of discharge under §727, the amount of $22,285 owed to Enterprise is otherwise nondischargeable pursuant to §523(a)(6).

### IV.    Conclusion

For the foregoing reasons, although $22,285 of the debt owed to Enterprise is nondischargeable pursuant to §523(a)(6), Enterprise proved the elements of §727(a)(4) by a preponderance of the evidence. Accordingly, the Debtor is denied a discharge. An appropriate order will be entered.

　　　　　　　　　　　　　　　　　　　　　__/s/ Carlota M. Böhm_____
Date: August 24, 2012　　　　　　　　　Carlota M. Böhm
　　　　　　　　　　　　　　　　　　　　　United States Bankruptcy Judge

**CASE ADMINISTRATOR TO MAIL TO:**

Office of the United States Trustee
Natalie Lutz Cardiello, Esq., Chapter 7 Trustee
Christine Saunders, Esq., Counsel to Plaintiff
John R. O'Keefe, Jr., Esq., Counsel to Plaintiff
Enterprise Bank, Plaintiff
Mark B. Peduto, Esq., Counsel to Debtor/Defendant
Gregory J. Hannan, Debtor/Defendant